## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

THE BROWARD COALITION OF
CONDOMINIUMS, HOMEOWNERS
ASSOCIATIONS AND COMMUNITY
ORGANIZATIONS INC., CHARLOTTE
GREENBARG, UNIVERSITY OF FLORIDA
COLLEGE LIBERTARIANS, NEAL CONNER,
NATIONAL TAXPAYERS UNION,
NATIONAL TAXPAYERS UNION FOUNDATION,
and DUANE PARDE,

       Plaintiffs,

v.                                  CASE NO.: 4:08cv445-SPM/WCS

KURT S. BROWNING, in his official
capacity as Florida Secretary of State,
JORGE L. CRUZ-BUSTILLO,
in his official capacity as Chair of the
Florida Elections Commission; and
DONALD W. RHODES, KAREN H.
UNGER, JOSE LUIS RODRIGUEZ,
THOMAS E. ROSSIN, GREGORY KING,
JULIE B. KANE, BELERIA F. FLOYD, and
WILLIAM H. HOLLIMON, in his official
capacities as members of the
Florida Elections Commission,

       Defendants.

_____/

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

     This cause comes before the Court on Plaintiffs' Motion for Preliminary

Injunction (doc. 10) and Memorandum of Law in support thereof (doc. 10-2).

Defendants have filed a response in opposition (doc. 27).  For the reasons set forth below, Plaintiffs' request for a preliminary injunction will be granted.

Plaintiffs have asked this Court to enjoin enforcement of Florida's electioneering communications laws—both as applied to Plaintiffs and on their face—before October 30, but sooner, if possible.  Because no court has ever upheld such a sweeping regulation of political speech and for the other reasons discussed below, Plaintiffs' motion is granted, and the electioneering communications provisions within Chapter 106 of the Florida Statutes are enjoined both on their face and as applied to Plaintiffs.

I.      **PLAINTIFFS AND THEIR SPEECH ACTIVITIES.**

Plaintiffs are four groups and their respective leaders.  The Broward Coalition is an all-volunteer, not-for-profit 501(c)(4) corporation that has been serving the Broward County, Florida, community for over 25 years.  Decl. of Charlotte Greenbarg in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 3.  A coalition of condominium associations, homeowners associations, and community organizations, the Coalition is dedicated to helping its members as well as the larger community make decisions about issues that affect them— locally, statewide, and nationally.  *Id.* at ¶ 3.  Charlotte Greenbarg serves as the group's president.  *Id.*  The University of Florida College Libertarians is a student-run campus club that seeks to spread the ideals of liberty and self-ownership.  Decl. of Neal Conner in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 3.  Neal Conner serves as the club's president.  *Id.* at ¶ 2.  The National Taxpayers Union (NTU) is a 501(c)(4) nonprofit, nonpartisan organization founded almost 40 years ago to promote lower taxes and smaller government at all political levels.  Decl. of Duane Parde in Supp. of Pls.' Mot. for Prelim.

Inj. ¶ 2.   The National Taxpayers Union Foundation (NTUF) is NTU's 501(c)(3)

affiliate.  *Id.* at ¶ 3.  Duane Parde is the president of both NTU and NTUF.

Before the election on November 4, Plaintiffs wish to publish communications

that (as the parties agree) would require them to be regulated pursuant to Florida's

electioneering communications laws.  For example, the Broward Coalition wishes to

publish a page in its forthcoming newsletter about pending statewide ballot issues.

Greenbarg Decl. at ¶¶ 4, 5.  The newsletter is distributed to members and non-members

and posted on the Internet.  *Id*. at ¶ 3.   The Coalition has refrained from putting the page

in its upcoming newsletter—which is due to be published and distributed at the end of

this week—because doing so will cause it to become regulated under the electioneering

communications laws.[1]  *Id*. at ¶ 6.  The Coalition has also removed from its website

references that mention candidates for fear that failing to do so would subject them to

regulation.  *Id*. at ¶ 13.  For the same reason, the University of Florida College

Libertarians has refrained from putting out fliers on campus advertising events at which

they want to host candidates; and it is holding off (pending a ruling on this motion) from

publishing a flier in which the club expresses its opinion about current ballot issues.

Conner Decl. at ¶¶ 11, 13.  NTU collected and drafted information regarding several of

Florida's ballot issues.  However, it did not include that information in this year's ballot

guide, and NTUF will not be able to use it in any of its publications.  Decl. of Kristina

Rasmussen in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 8.  Like the other Plaintiffs, NTU and

NTUF have refrained from speaking because of concerns that the State's electioneering

---

[1] A copy of the proposed communications for each Plaintiff is attached as an appendix to
this order.

communications laws will be applied to its speech and force it to submit to burdensome registration, reporting, and disclosure requirements for electioneering communications organizations.  Parde Decl. at ¶ 5; Rasmussen Decl. at ¶¶ 7-8.

Plaintiffs state that complying with these requirements would consume a considerable amount of their time and resources and would hinder their groups' ability to pursue their respective missions.  Greenbarg Decl. at ¶¶ 11, 13; Conner Decl. at ¶¶ 16, 17; Rasmussen Decl. at ¶¶ 10-11; Parde Decl. at ¶ 6.  NTU is particularly concerned about being compelled to reveal the identity of its donors, some who prefer to remain anonymous because they are concerned about retaliation from the government should their identities become known.  Parde Decl. at ¶¶ 7-9.

None of the above-mentioned publications contain express advocacy (that is, phrases such as "vote for" or "vote against"), which is regulated by Florida's laws concerning political committees.  But because the publications are "electioneering communications," Plaintiff must first register with the state and comply with rules that are nearly identical to those that political committees must follow; failing to do so will subject them to fines and even criminal prosecution.  They seek an injunction so that they may issue their publications (or, in the case of NTU, update its previously issued ballot guide on its website by adding a Florida section) in which a candidate or ballot issue is mentioned before the November 4 election without being subject to the "electioneering communication" laws.  Those laws are described below.

## II.     FLORIDA'S ELECTIONEERING COMMUNICATIONS LAWS.

Under Florida law, an "electioneering communication" includes "a paid expression in any communications media" other than the spoken word in direct conversation that "[r]efers to or depicts a clearly identified candidate for office or contains a clear reference indicating that an issue is to be voted on at an election, without expressly advocating the election or defeat of a candidate or the passage or defeat of an issue." Fla. Stat. § 106.011(18)(a).  Certain narrow exceptions apply; excluded from the definition are statements or depictions in a pre-existing organization's newsletter that is distributed *only* to members of that organization; statements in various news media; and communications that constitute a public debate or forum that include at least two opposing candidates or one advocate and one opponent of an issue.  Fla. Stat. § 106.011(18)(b).  Moreover, for speech about candidates, the communication must be targeted to reach the relevant electorate—that is, to reach 1,000 or more people in the geographic area the candidate would represent if elected—to be captured by the law.  Fla. Stat. § 106.011(18)(a)2.  "Communications media" means "broadcasting stations, newspapers, magazines, outdoor advertising facilities, printers, direct mail, advertising agencies, the Internet, and telephone companies." § 106.011(13).

### A.     Regulation of Groups and Individuals Who Make "Electioneering Communications."

Under the statutory scheme, all "electioneering communications" in Florida, by both groups and individuals (except those for which an individual spends less than $100), are regulated.  *See* Fla. Stat. §§ 106.011(1)(b)3 & 106.071.

### 1.   Groups: "Electioneering Communications Organizations."

A group that makes an electioneering communication must register as an "electioneering communications organization" ("ECO").  An ECO is any group not otherwise registered under Florida's campaign financing law "whose activities are limited to making expenditures for electioneering communications or accepting contributions for the purpose of making electioneering communications."  § 106.011(19).  The Secretary of State—through the Division of Elections—interprets this provision to include any group whose *election-related* activities are limited to electioneering communications. *See* Exhibit B attached to Declaration of Robert W. Gall, *Electioneering Communications Organizations; Political Committees*, DE 08-08, Op. Dept. of State, Div. of Elections (June 18, 2008).  This reading makes sense, given that the definition is found within Chapter 106, which regulates only election-related activities.[2]

### 2.   Specific Requirements for "Electioneering Communications Organizations."

Electioneering communications organizations are "required to register with and report expenditures and contributions . . . to the Division of Elections in the same manner, at the same time, and subject to the same penalties as a political committee

---

[2] Defendants agree with this reading of the statute.  Any other reading of the statute would allow all groups to avoid registration as an ECO by engaging in *de minimis* additional activity, such as hosting an annual bake-sale for charity or distributing one annual newsletter containing no regulated speech.  It would also create the absurd situation in which an individual must register her electioneering communications no matter what her other "activities" are—and all individuals, by definition, have other activities such as eating, breathing, and sleeping—but could escape registration if she creates or belong to a group that, like virtually every group, can truthfully state that it has more than just one activity.

supporting or opposing an issue or a legislative candidate, except as otherwise specifically provided in [Chapter 106]." § 106.011(1)(b)3.  Thus, any group that is an electioneering communications organization is subject to a wide array of requirements, including:

- Registering with the government within 24 hours of its organization or receiving information that causes it to anticipate receiving or expending funds for an electioneering communication, Fla. Stat. § 106.03(1)(b)

- Appointing a campaign treasurer (or custodian of the books), § 106.03(2)(d)

- Designating a depository, § 106.03(2)(k)

- Making regular reports, § 106.07(1)

- Recording expenditures, § 106.07(4)(a)

- Disclosing *all* donors—even those who never intended their gift to go towards political speech, § 106.07(4)(a)1 and Gall Decl., Ex. A at 3

- Restricting expenditures and contributions, including not spending money raised in the five days before the election, refusing contributions by 527s or 501(c)(4)s that are not—themselves—registered, and refusing all cash contributions over $50, § 106.08(4)(b), § 106.08(5)(d), & § 106.09

- Including a prominent "disclaimer" on each communication that reads "Paid electioneering communication paid for by (Name and address of person paying for communication)." § 106.1439

- Allowing random audits by the government, § 106.22(10).

According to the Commission, there are almost 100 separate violations possible under the campaign finance code.  *See* Florida Elections Commission, Jurisdiction, http://www.fec. state.fl.us/juris/index.html.  The Secretary of State and "any person" may file a sworn complaint with the Florida Elections Commission.  Fla. Stat. § 106.26(1).  All violations are subject to civil penalties, Fla. Stat. §§ 106.265(1) & 106.07(8), and many are subject to additional criminal penalties and jail time.  *See*, *e.g.*, §§ 106.08(7), 106.09(2), 106.19,

& 106.1439(2).  Information from reports filed with the Secretary is made available on the Secretary's website.  *See* Fla. Stat. § 106.0706.

### 3. Individuals and Requirements That Apply to Them.

Under § 106.071, "each individual who makes an expenditure for an electioneering communication which is not otherwise reported pursuant to [Chapter 106]"—i.e., is not reported by a group that is an ECO, a political committee, or a committee of continuous existence—and spends $100 or more to do so has to "file periodic reports of such expenditures in the same manner, at the same time, subject to the same penalties, and with the same officer as a political committee supporting or opposing such candidate or issue."  Thus, the only way that an electioneering communication does not have to be regulated is (1) if it is made by an individual and (2) the individual spends less than $100 on the communication.

## III. LEGAL ANALYSIS.

As noted above, it is not disputed that the speech in which Plaintiffs wish to engage is regulated by the electioneering communications laws and does not fall within any of its exceptions.[3]  Thus, the only issue for this Court to decide is whether Defendants can constitutionally regulate those communications.

Plaintiffs are entitled to injunctive relief if they can demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) that their injury outweighs the harm to the State; and (4) that granting an injunction will not adversely impact the

---

[3] The Broward Coalition's newsletter is distributed to non-members and placed on the Internet.  Thus, it does fit into the newsletter exception discussed above.

public interest. *Statewide Detective Agency v. Miller*, 115 F.3d 904, 905 (11th Cir. 1997). As demonstrated below, each of these factors weighs in favor of the Plaintiffs.

### A.      Plaintiffs Are Substantially Likely to Succeed On the Merits.

The First Amendment protects the right to free speech on political matters, including candidates and ballot issues; it also protects the right of citizens to associate with one another as part of political discourse. When government infringes upon these rights, it must demonstrate a compelling interest and then narrowly tailor the restrictions that purportedly serve that interest. Florida's electioneering communications laws regulate virtually *all* political speech about ballot issues and candidates; the Supreme Court has never recognized a compelling interest that allows such a wide-open regulation. Thus, Plaintiffs are substantially likely to succeed on their claims that Florida's electioneering communications laws are unconstitutional, both as applied to them and on their face.

### 1.      Restrictions On the Plaintiffs' First Amendment Rights Are Subject to Strict Scrutiny.

Political speech is at the core of the First Amendment. As the Supreme Court has noted, the First Amendment "was fashioned to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484 (1957), and expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). These principles "extend equally to issue-based elections . . . ." *McIntyre v. Ohio Elections Comm'n*, 514

U.S. 334, 347 (1995).  The First Amendment also protects political association.  As the

Supreme Court noted in *NAACP v. Alabama*, "[E]ffective advocacy of both public and

private points of view, particularly controversial ones, is undeniably enhanced by group

association."  357 U.S. 449, 460 (1958); *see also Buckley v. Valeo*, 424 U.S. 1, 15 (1976)

("The First Amendment protects political association as well as political expression.").

      Groups swept up by Florida's electioneering communications laws, however, are

subject to numerous regulatory requirements.  ECOs must register with the state before

they may legally mention the name of a candidate or ballot measure in their public

communications.  This registration requirement constitutes a content-based prior

restraint.  *See Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004)

(content-based prior restraints "are presumptively unconstitutional and face strict

scrutiny").  ECOs are subject to reporting and disclosure requirements that "impose well-

documented and onerous burdens, particularly on small nonprofits." *Fed. Election

Comm'n  v. Wisc. Right to Life* (*WRTL II*), 127 S. Ct. 2657, 2671 n.9 (2007); *see also

NAACP*, 357 U.S. at 463 (noting the "deterrent effect which [compelled] disclosures may

well have on the free exercise [of the] constitutionally protected right of association").

ECOs are required to include disclaimers in their communications that read "Paid

electioneering communication paid for by (name and address of person paying for

communication)."  This disclaimer is a form of compelled speech that the Supreme Court

has recognized violates the right to anonymous speech.  *McIntyre*, 514 U.S. 334, 355

(1995) (law requiring "compelled self-identification on all election-related writings" was

"particularly intrusive").  Finally, ECOs are prohibited from spending on their

communications any money raised in the last five days before an election, a limit on expenditures that "heavily burdens core First Amendment expression." *Buckley*, 424 U.S. at 48.

Because the Florida statute "burdens political speech, it is subject to strict scrutiny." *WRTL II*, 127 S. Ct. at 2664.  Moreover, it is the State that must demonstrate that the law will likely be upheld because the burden of proof at the preliminary injunction stage tracks the burden of proof at trial.  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).  To prevail in this case, then, Defendants must demonstrate a compelling state interest for each of the challenged laws, and they must show that the laws are narrowly tailored to achieve that interest.  *See id.* at 429; *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).  Defendants must also demonstrate that the application of the laws to the Plaintiffs satisfies strict scrutiny as well.  *See WRTL II*, 127 S. Ct. at 2671.

At oral argument, Defendants argued that this Court should instead apply a heightened form of intermediate scrutiny that the Supreme Court has applied to "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate."  *See*, *e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 79 (1976).  The Supreme Court, however, has never applied this lesser standard to such a broad regulation of core political speech by grassroots groups like Plaintiffs.  First, in regard to ballot-issue speech, in every case the Supreme Court has dealt with a law that

burdened speech in that context, it has applied strict scrutiny and struck down the law.[4] *See Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 204 (1999); *Meyer v. Grant*, 486 U.S. 414, 420, 428 (1988); *McIntyre*, 514 U.S. at 345-47; *Citizens Against Rent Control*, 454 U.S. at 294, 300; *Bellotti*, 435 U.S. at 786, 795.  Second, in regard to speech about candidates, the Court has always applied strict scrutiny where the speech at issue was by groups that did not have the major purpose of influencing elections, *see Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 256, 263, or where the speech at issue was not the functional equivalent of express advocacy.  *See WRTL II*, 127 S. Ct. at 2664.

Even if this Court were to apply scrutiny that is less than strict, the outcome would be no different.  No matter what level of scrutiny applies, when First Amendment rights are at stake, the government has the burden of proving the constitutionality of the challenged law.  *See Watchtower Bible & Tract Soc'y of New York City v. Vill. of Stratton*, 536 U.S. 150, 170 (2002) ("When the Government restricts speech, *the Government bears the burden* of proving the constitutionality of its actions." (emphasis added)) (Breyer, J., concurring) (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816 (2000).  This requires real evidence.  *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986) (requiring the city to show evidence "reasonably believed to be relevant to the problem the city addresses").  It is not enough for Defendants to conjecture that an injunction "could" confuse political actors, sanction

---

[4] The Supreme Court has made clear that the term "exacting" scrutiny is synonymous with strict scrutiny.  *See Buckley v. ACLF*, 525 U.S. at 192 n.12 (majority opinion) & 206 (Thomas, J., concurring); *McIntyre*, 514 U.S. at 346 & n.10.

excessive and unregulated campaign contributions, and deprive the public of important information. Defs.' Resp. Opp. Pls.' Mot. Prelim. Inj. [hereinafter Defs.' Resp.] at 19. *See Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden…."); s*ee also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (Kennedy, J., plurality opinion) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"). Moreover, Defendants' conjectures must be weighed against the certainty that allowing the law to stand will deprive the public of the information that the Broward Coalition, the University of Florida College Libertarians, and NTU/NTUF would like to provide. *Watchtower***,** 536 U.S. at 165 (courts must determine "whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve"). Of course, any "tie goes to the speaker, not the censor." *WRTL II*, 127 S.Ct. at 2669.

Furthermore, if the State lacks the power to regulate Plaintiffs' speech, it simply cannot regulate it, even under a reduced level of scrutiny. *See Nat'l Right to Work Legal Def. and Educ. Found., Inc. v. Herbert*, No. 2:07-cv-809, 2008 WL 4181336, at *10 (D. Utah Sept. 8, 2008) ("[B]efore applying exacting scrutiny . . . the court must first determine whether the activities being regulated are unambiguously campaign related [and therefore potentially subject to regulation]."); *see also N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 281 (4th Cir. 2008) ("[O]nly unambiguously campaign related communications have a sufficiently close relationship to the government's acknowledged

interest in preventing corruption to be constitutionally regulable.").   Defendants have not

met their burden of demonstrating a compelling interest for regulating most of the speech

captured by its electioneering communications laws.

> **2.      The State Has No Compelling Interest in Regulating Speech
> That is Neither Express Advocacy nor its Functional
> Equivalent.**

The rights to speak and associate freely regarding issues of public concern are

zealously guarded by the First Amendment.  Unfettered and unregulated speech is the

rule, not the exception.  Just because a restriction is labeled as a restriction on campaign

finance does not mean that it faces an easier path to constitutionality than a restriction

outside that context.  Indeed, as the Supreme Court made clear in its seminal decision on

campaign finance law, *Buckley v. Valeo*, governments may regulate only those narrow

categories of political speech that are "unambiguously related to the campaign of a

particular . . . candidate."  424 U.S. at 80.

The Court has recognized only two narrowly drawn categories that fall within that

exception.  The first of these categories includes "communications that in express terms

advocate the election or defeat of a clearly identified candidate for federal office."  *Id.* at

44.  This category includes what have come to be known as "magic words"—phrases

such as "vote for" or "vote against" in reference to candidates.  *See McConnell v. Fed.*

*Election Comm'n*, 540 U.S. 93, 126 (2003); *see also Buckley*, 424 U.S. at 44 n.52.

The second category includes communications that constitute "the functional

equivalent of express advocacy."  *McConnell*, 540 U.S. at 206.  In order to fall into this

very narrowly drawn category, speech must satisfy two requirements.  *Leake*, 525 F.3d at

282.  First, the speech must be "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* (quoting *WRTL II*, 127 S. Ct. at 2667).  Second, because the Court has never held that the regulation of "electioneering communications" beyond how that term is defined in the Bipartisan Campaign Reform Act of 2002 ("BCRA") is permissible, the outer limit of regulation tracks BCRA's definition:  a "broadcast, cable, or satellite communication that refers to a clearly identified candidate within sixty days of a general election or thirty days of a primary election." *Leake*, 525 F.3d at 282 (citing *WRTL II*, 127 S. Ct. at 2669 n.7).  This two-pronged analysis is consistent with the First Amendment's command that "when it comes to defining what speech qualifies as the functional equivalent of express advocacy subject to . . . a ban . . . we give the benefit of the doubt to speech, not censorship." *WRTL II*, 127 S. Ct. at 2674.

As the Court noted in *WRTL II*, it "has never recognized a compelling interest in regulating ads . . . that are neither express advocacy nor its functional equivalent."  127 S. Ct. at 2671.  But Florida is attempting to regulate much more speech than is contained in those two narrow categories.

The Florida statute is a sweeping regulation of speech—i.e.,  virtually all paid communications about ballot issues and candidates.  As explained above, the Supreme Court established the outer bounds of political speech that may be regulated in *McConnell* and *WRTL II*.  Since *WRTL II*, there have been only three cases where courts have addressed the constitutionality of attempts to regulate speech that went beyond the scope of the federal definition of "electioneering communication."  In all three cases,

those attempts were rejected.  *See N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir.

2008); *Ctr. for Individual Freedom, Inc. v. Ireland*, Nos. 1:08-cv-00190 & 1:08-cv-

01133, 2008 WL 4642268 (S.D. W.Va. Oct. 17, 2008); *Nat'l Right to Work Legal Def. &*

*Educ. Found., Inc. v. Herbert*, No. 2:07-CV-809, 2008 WL 4181336 (D. Utah Sept. 8,

2008).  On the other hand, the two post-*WRTL II* cases cited by Defendants, Defs.' Resp.

at 6, that upheld statutes regulating "electioneering communications" involved either the

use of that term as defined in BCRA—that is, a broadcast, cable, or satellite

communication that refers to a clearly identified candidate (not a ballot issue) within

thirty days of a primary election or sixty days of a general election—or a similar state

definition.  *See Citizens United v. Fed. Election Comm'n*, 530 F. Supp.2d 274 (D.D.C.

2008); *Ohio Right to Life Society, Inc. v. Ohio Elections Comm'n*, No. 2:08-cv-00492,

2008 WL 4186312 (S.D. Ohio Sept. 5, 2008).[5]

      Defendants argue that *Buckley* and *McConnell* allow states to require disclosure

for "the entire range of electioneering communications."  Defs.' Resp. at 7-8 (quoting

*McConnell*, 540 U.S. at 196).  By this, they apparently mean that *Buckley* and *McConnell*

allow the regulation of every kind of communication in which a candidate or ballot issue

is mentioned.  But it is clear that the "entire range" to which *McConnell* referred was

speech that met the narrow definition of "electioneering communication" in BCRA.  No

broader definition was before the Court.  Thus, it is impossible to read *Buckley* or

---

[5] Defendants' reliance on *The Real Truth About Obama, Inc. v. Federal Election Commission*, No. 3:08-cv-483, 2008 WL 4416282 (E.D. Va. Sept. 24, 2008), which also dealt with BCRA's far-narrower electioneering communication provisions, is similarly misplaced.

*McConnell* as sanctioning the regulation of all the speech encompassed within Florida's expansive and much broader definition of "electioneering communication."

Defendants also cite *McConnell* for the proposition that there is not a constitutionally compelled line between express advocacy and issue advocacy. Defs.' Resp. at 9. But this claim completely ignores *WRTL II*. *WRTL II* held that there is a line between speech that is the functional equivalent of express advocacy and the vast majority of political speech falling outside that category and that line *is* constitutionally compelled. 127 S. Ct. at 2670-74.

Additionally, Defendants cite *McConnell* for the proposition that political speech regarding ballot issues can be regulated. Defs.' Resp. at 8-9. *McConnell*, however, contains no such holding; nor could it, since BCRA does not regulate speech about ballot issues. *McConnell* was about the regulation of sham issue ads that were really advocacy for candidates but put forth by big corporations and unions. Once again, as *WRTL II* makes clear, this is a narrow exception to the general rule that speech about issues may not be regulated.

Furthermore, contrary to Defendants' assertion, Defs.' Resp. at 9 n.4, neither *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), nor any other decision from the Supreme Court has held that speech about ballot issues can be regulated on the same terms as speech about candidates. Indeed, when the Court has been confronted with regulations of speech about ballot issues, it has struck them down. *See, e.g., Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 297-98 (1981); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 789-92 (1978) (both striking down restrictions on

ballot issue speech because there is no possibility of quid pro quo corruption in a ballot issue election).[6]

          **a.**     **Florida's Electioneering Communications Law is Unconstitutional as Applied to Plaintiffs Because Their Speech is Neither Express Advocacy Nor its Functional Equivalent.**

As described above, none of the speech in which Plaintiffs wish to engage is express advocacy. Indeed, that is one of the reasons that the Plaintiffs' speech qualifies as "electioneering communications"; if Plaintiffs' speech *were* express advocacy, the plaintiff groups would be regulated as "political committees" rather than as "electioneering communications organizations." Fla. Stat. § 106.011(1)(a)1. Nor is it the functional equivalent of express advocacy because, for several reasons, the Plaintiffs' speech does not satisfy the two-pronged test from *WRTL II*, discussed earlier.

---

[6] To the extent that Defendants suggest that disclosure for ballot issue speech has been sanctioned by *Bellotti* and *Citizens Against Rent Control*, Defs.' Resp. at 7, they are incorrect. The statements regarding disclosure in those cases are dicta because the constitutionality of the disclosure provisions was not at issue. Moreover, the disclosure requirements were significantly less burdensome than Florida's. *See Citizens Against Rent Control*, 434 U.S. at 294 n.4 ($50+ contributors listed in the local newspaper twice during the last seven days before the election). In both cases, the regulations regarding ballot issues that were actually at issue were all struck down. *Id.*, 454 U.S. at 292, 297 ($250 contribution limit for ballot issues held unconstitutional); *Bellotti*, 435 U.S. at 775, 776, 789-92 (ban on corporate expenditures related to referenda held unconstitutional). Notably, some of the other cases about ballot issues cited by Defendants actually hold that the government cannot apply political committee requirements to groups like Plaintiffs. *Cal. Pro-Life Council, Inc. v. Randolph,* 507 F.3d 1172, 1187-89 (9th Cir. 2007) (holding that California's political action committee requirements could not be constitutionally imposed on groups discussing only ballot measures, rather than candidates); *Richey v. Tyson*, 120 F. Supp.2d 1298, 1318 (S.D. Ala. 2000) (concluding that Alabama's "registration, organizational and recordkeeping requirements are unconstitutional as applied to organizations whose major purpose is not to engage in election activity").

First, none of the Plaintiffs are issuing a communication via broadcast, cable, or satellite.  Second, with regard to the University of Florida College Libertarians' speech about candidates, simply mentioning that a candidate will be a guest at a meeting is certainly susceptible of a reasonable interpretation other than as an appeal to vote for or against that candidate.  The same is true for the mere mention of a candidate's name in regard to a policy issue discussion in the Broward Coalition's newsletter.  *See WRTL II*, 127 S. Ct. at 2683 ("Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election. Where the First Amendment is implicated, the tie goes to the speaker, not the censor.").  Third, Plaintiffs' speech relating to ballot issues cannot, by definition, be express advocacy because it has nothing to do with candidates. The Supreme Court has never equated advocacy of particular ballot issues to express advocacy for or against a candidate; indeed, it has repeatedly recognized that advocacy of ballot issues enjoys even stronger protection than express advocacy for candidates because it raises absolutely no danger of corruption or the appearance of corruption.  *See McIntyre*, 514 U.S. at 356 ("Not only is the Ohio statute's infringement on [ballot-issue related] speech more intrusive than the *Buckley* disclosure requirement, but it rests on different and less powerful state interests."); *Bellotti*, 435 U.S. at 790 ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue."); *Citizens Against Rent Control*, 454 U.S. at 297-98 (same).

Defendants' arguments that the Plaintiffs' ballot issue speech can be the functional equivalent of express advocacy—once again, a term developed in and confined

to the candidate context—simply find no basis in *Buckley*, *McConnell*, *WRTL II*, or any other case from the Supreme Court.  If expressing an opinion about ballot issues could constitute the functional equivalent of express advocacy, then the State would be able to regulate virtually all speech about ballot issues.  This would mean that ballot issue speech would receive less, not more, protection than speech about candidates.  Furthermore, this result would clash with *WRTL II*, which makes clear that the vast majority of political speech should remain unregulated.  127 S. Ct. at 2672 (rejecting an expansive definition of "functional equivalent").

        Thus, Defendants cannot demonstrate a compelling interest in regulating Plaintiffs' speech.[7]  And because Plaintiffs' speech cannot be regulated, it necessarily follows that the State has no interest in requiring Plaintiffs to submit to a prior restraint on their speech; to restructure their organizations and comply with registration, reporting, and disclosure requirements requiring, among other things, information regarding all of their donors; to surrender their ability to speak and associate anonymously; and to accept

_____

[7] Defendants argue that the disclosure requirements are not burdensome, and thus should be allowed.  But Defendants' argument misses the point that disclosure requirements simply cannot be applied to speech that is neither express advocacy nor the functional equivalent of express advocacy.  And, as explained in the text above, disclosure requirements cannot stand if their underlying regulatory regime is, like Florida's electioneering communications laws, unconstitutional.  The Supreme Court has specifically recognized that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."  *Buckley*, 424 U.S. at 64.  The Court has also recognized that the burdens of disclosure are particularly onerous for grassroots organizations.  *MCFL*, 479 U.S. at 255 (plurality opinion).  Indeed, Plaintiffs' declarations indicate that Florida's disclosure requirements would be burdensome for their organizations.  Furthermore, in *Davis v. Federal Election Commission*, the Supreme Court struck a requirement that a millionaire fill out a few forms; if that requirement was burdensome as to him and unconstitutional, then surely the same is true in regard to the more onerous requirements imposed by Florida's electioneering communications laws.  128 S. Ct. 2759, 2775 (2008).

restrictions on Plaintiffs' right to make expenditures five days before an election.  As the Supreme Court recently made clear, when disclosure requirements are part of a broader regulatory regime that is unconstitutional, it necessarily follows that the disclosure requirements are unconstitutional.  *See Davis v. Fed. Election Comm'n*, 128 S. Ct. 2759, 2775 (2008) (striking down disclosure requirements that were part of the asymmetrical contribution limits for the so-called Millionaires' Amendment).  Thus, Plaintiffs have a substantial likelihood of succeeding on the merits in regard to their as-applied challenge to the definition of "electioneering communications" and all the regulations that the State imposes on those who make those communications.

### b. Florida's Electioneering Communications Laws are Unconstitutional on Their Face Because the Definition of "Electioneering Communication" is Substantially Overbroad and Vague.

Furthermore, Plaintiffs have a substantial likelihood of succeeding on the merits in regard to their facial challenge to Florida's definition of electioneering communications and its attendant regulation of speech.  For that reason, the injunction should extend not just to them, but also to all speakers who make electioneering communications.  Florida's definition of electioneering communication goes beyond regulation of  express advocacy; but in order to avoid being unconstitutional on its face, it must go no further than  the functional equivalent of express advocacy in a manner that is neither unconstitutionally overbroad nor vague.  On both counts, the definition fails.

### i. Overbreadth

In the context of the First Amendment, a regulation is unconstitutionally overbroad "if the impermissible applications of the law are substantial when judged in

relation to the statute's plainly legitimate sweep." *City of Chi. v. Morales*, 527 U.S. 41, 52 (1999) (internal quotation marks omitted).  That is the case here.  First, Florida's definition of "electioneering communication" is much broader than BCRA's in several respects.  While BCRA's definition is limited to speech about candidates, Florida's includes speech about ballot issues.  While BCRA's definition includes only a narrow scope of media (a "broadcast, cable, or satellite communication"), Florida's includes virtually every kind of media ("broadcasting stations, newspapers, magazines, outdoor advertising facilities, printers, direct mail, advertising agencies, the Internet, and telephone companies . . .").  Additionally, while BCRA's definition limits its temporal scope to communications within sixty days of an election or thirty days of a primary, Florida's definition applies as soon as a candidate starts receiving contributions or making expenditures with a view toward being nominated or elected.  § 106.011(16)(c) (definition of "candidate"); § 106.011(18)(a) (definition of "electioneering communication").

Second, it is clear that the definition of "electioneering communication" includes speech that is clearly susceptible to a reasonable interpretation other than as an appeal to vote for or against a specific candidate.  As noted above, it is nearly impossible for speech about ballot issues to constitute the functional equivalent of express advocacy, but the definition nonetheless regulates that speech.  And although the definition does encompass at least some speech about candidates that can be considered the functional equivalent of express advocacy, it also sweeps up any discussion about policy before an election in which a candidate's name is mentioned.  For example, a group blog discussion

about state insurance law would be captured by the definition if a participant mentions an insurance bill named after a legislator who is running for reelection.  Indeed, any discussion of public policy is very likely to include mention of a candidate's name, especially if he is already an elected politician—after all, politicians are responsible for making public policy.  But as the Supreme Court has recognized, "[d]iscussion of issues cannot be suppressed simply because the issues may also be pertinent in an election." *WRTL II*, 127 S. Ct. at 2669.

Applying this two-part test for what constitutes the functional equivalent of express advocacy—and can thus be regulated—the Fourth Circuit in *Leake* struck down a regulation of political speech in North Carolina that was similar in its scope to Florida's. 525 F.3d at 283.  The court was particularly concerned that the North Carolina regulation would swallow up practically all ordinary political speech.  "The danger in this area— when dealing with a broadly empowered bureaucracy—is not that speakers may disguise electoral messages as issue advocacy, but rather that simple issue advocacy will be suppressed by some regulator who fears it may bear conceivably on some campaign. If the First Amendment protects anything, it is the right of political speakers to express their beliefs without having to fear subsequent civil and criminal reprisals from regulators authorized to employ broad and vague definitions as they see fit."  *Leake*, 525 F.3d at 302 (citing *Buckley*, 424 U.S. at 43).   Following *Leake*'s lead, the District Court for the Southern District of West Virginia, in granting a motion for a preliminary injunction concerning a similar regulation, found that the plaintiffs in that case were substantially likely to succeed on the merits of their facial challenge regarding overbreadth.  *Ctr. for*

*Individual Freedom, Inc. v. Ireland*, Nos. 1:08-cv-00190 & 1:08-cv-01133, 2008 WL 4642268, at *10-12 (S.D. W.Va. Oct. 17, 2008).[8]

Defendants cite statements in *Washington State Grange*—a case about how Washington State's primaries are conducted—in support of their argument that a facial challenge cannot succeed.  Defs.' Resp. at 4.  But the Supreme Court recognized in *Grange* that facial challenges are appropriate in the First Amendment context and that courts can overturn an overbroad law when a "substantial number" of the law's applications are unconstitutional and when the Plaintiffs have described those instances of overbreadth.  *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191 n.6 (2008); *see also Leake*, 525 F.3d at 284-85.  As described in Plaintiffs' opening brief, Florida's law sweeps up speech by any group—or any individual who spends $100—in any paid communications media, if it mentions a candidate or pending ballot issue.  It is difficult to imagine a more overbroad law.  A simple web search reveals that numerous organizations are discussing Florida's upcoming ballot issues, including groups such as the League of Women Voters and VoteSmartFlorida.org, and thus would be subject to Florida's electioneering communications laws.[9]  Far more may unwittingly

---

[8] Unlike the statute at issue in *National Right to Work Legal Defense and Education Foundation, Inc. v. Herbert*, No. 2:07-cv-809, 2008 WL 4181336, at *13 (D. Utah Sept. 8, 2008), and for the reasons discussed in more depth below, Florida's law cannot be saved from a facial challenge by a narrowing construction.

[9] The League of Women Voters of Tallahassee, VoteSmartFlorida.org, and the Florida League of Cities all have ballot guides on the web.  *See* http://Tallahassee.fl.lwvnet.org/StateBallots.html; http://www.votesmartflorida.org/mx/hm.asp?id=Amendments_November2008; and http://www.flcities.com/legislative/files/A228852694304B2092B40D75B87C847C.pdf. The ACLU posted legal arguments on Amendments 7 and 9 (before they were removed from the ballot).  *See* http://www.aclu.org/religion/govtfunding/35646prs20080613.html.

mention the name of a candidate in the context of policy discussions or other discussions that have nothing to do with political campaigns.   As the Fourth Circuit held in *Leake*, "[n]othing in *McConnell, WRTL* [*II*], or any First Amendment tradition that we know of forces political speakers to incur these sorts of protracted costs [a long series of as-applied challenges that would take years to resolve] to ascertain nothing more than the scope of the most basic right in a democratic society—the right to engage in discussion of issues of unquestioned public importance."   525 F.3d at 285.

### ii.      Vagueness

The definition of electioneering communication is also unconstitutionally vague because it is impossible to know—in advance—whether the law will apply to a particular communication about candidates.   <u>McConnell</u>, 540 U.S. at 170 (statutory language may be considered constitutionally vague if it fails to "clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision").

In regard to communications mentioning candidates, the definition of "electioneering communication" states that a paid communication about a candidate will become an electioneering communication if the speech is targeted towards the relevant electorate; that is, if the communication will be received by 1,000 or more persons in the geographic area the candidate hopes to represent.   In today's Internet age, it is impossible to know—in advance—whether any particular Internet communication will fall within that definition.   A website that is linked to by a popular blog could overnight quadruple

---

All of the above-referenced publications fall within Florida's broad definition of "electioneering communications."

the number of hits to that website.  And an organization would have no way of knowing whether each hit represents a separate recipient or even whether the recipient is located in the targeted area.  Low-tech advertising may raise problems as well.  For instance, if the University of Florida College Libertarians put up posters and fliers advertising their events in the University student center and dining hall—as they have regularly done in the past—it is impossible for them to know how many people would actually look at the posters and fliers.  Therefore, it would be nearly impossible for any of the Plaintiffs to ascertain whether their flyer or website actually constitutes "electioneering communication."

This vagueness cannot be squared with the requirement that government regulate in the area of the First Amendment "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  As the Supreme Court has recognized, "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked."  *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotation marks omitted).  A law that fails to satisfy this standard and that is "so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, *on its face*, as contrary to the Fourteenth Amendment." *Winters v. New York*, 333 U.S. 507, 509 (1948) (emphasis added).   Such is the case with Florida's definition of "electioneering communication."

**IV.     THE DEFINITION OF ELECTIONEERING COMMUNICATIONS ORGANIZATION IS OVERBROAD.**

Florida's electioneering communications laws reach organizations and individuals, like the plaintiffs in this case, that the government has no compelling interest in regulating.  The Supreme Court has made absolutely clear that the burdensome structural and reporting requirements that apply to PACs may *only* be visited upon groups "the major purpose of which is the nomination or election of a candidate."  *Buckley*, 424 U.S. at 79; *see also MCFL*, 479 U.S. at 262.  Even if we assume that these burdens are permissible outside of the candidate context and that groups who speak about ballot measure may sometimes be subject to PAC-like burdens, the Supreme Court has never endorsed a law as broad as Florida's, under which groups and individuals may be subject to all of the burdens that apply to fully regulated PACs merely for *mentioning* the names of candidates or ballot issues in their public communications.

The Fourth Circuit's recent decision in *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008), is instructive.  In *Leake*, the Fourth Circuit struck down North Carolina's definition of "political committee," which extended PAC-like burdens to any group having merely "*a* major purpose" of influencing elections.  *Leake*, 525 F.3d at 289.  The court held that definition was too broad, going well beyond what *Buckley*'s test—*the* major purpose—would permit.  As that court recognized, "[p]ermitting the regulation of organizations as political committees when the goal of influencing elections is merely one of multiple 'major purposes' threatens the regulation of too much ordinary political speech to be constitutional."  *Id.* at 288-89.  Accordingly, because North Carolina's law "[ran] the risk of burdening a substantial amount of

constitutionally protected political speech," it was facially unconstitutional. *Id.* at 289-90.

But North Carolina's law, while unconstitutionally overbroad, was more narrowly tailored than Florida's. Florida's electioneering communications laws are not limited to groups with "a major purpose" of influencing elections. Indeed, under Florida's law, groups are subject to the full panoply of PAC-like registration and reporting requirements if they engage in *any* amount of speech related to elections, regardless of how minor a part of their overall activity that speech might be. And for each of the plaintiffs in this case, electioneering communications represent a tiny fraction of their overall activity. *See* Conner Decl. at ¶¶ 3, 4, 6, 7 (describing group's election- and non-election-related activities); Greenbarg Decl. at ¶¶ 3, 4, 5, 7 (same); Parde Decl. at ¶¶ 2, 3, 5 (same).

*Buckley*'s application to the facts of this case is clear. None of the Plaintiffs has "the major purpose" of influencing elections. Because they are, nevertheless, swept within the definition of "electioneering communications organizations," Florida's electioneering communications laws are unconstitutionally overbroad. Defendants can cite to no case in which courts have applied PAC requirements on groups, like Plaintiffs, that are not political committees. Indeed, the Supreme Court has repeatedly turned back attempts to regulate the speech of individuals and citizens' groups that are not professional political committees, even when they engage when they are actively promoting the passage of ballot issues and the election of candidates. *See, e.g., McIntyre* 514 U.S. at 357 (holding that disclosure requirements that indiscriminately outlawed leafleting by private individual violated the First Amendment); *MCFL*, 479 U.S. at 241

(concluding that the restriction on independent spending in section 2 U.S.C. § 441(b) is unconstitutional as applied to nonprofit corporation funded by member contributions and fundraisers such as bake sales). If Defendants' arguments were correct, then these cases would have been decided differently.

## V.     IRREPARABLE INJURY AND THE BALANCE OF HARMS

In addition to having a high likelihood of success on the merits, Plaintiffs also satisfy the remaining elements necessary to secure injunctive relief. "The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (same). Unless they submit to regulation, Plaintiffs cannot speak without violating the law. Refraining from engaging in First Amendment activity because of fear of violating the law is a concrete—not hypothetical—injury. *See Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (holding that a statute that arguably covers the intended conduct is likely to chill expression and is thus subject to challenge); *see also Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) ("In the First-Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law. Rather, actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance, which is what is alleged here, the injury is self-censorship.") (quoting *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1248

(11th Cir. 1998)).[10]   Additionally, the balance of interests favors the Plaintiffs because the

Supreme Court has made clear that in any conflict between First Amendment rights and

regulation, courts "must give the benefit of any doubt to protecting rather than stifling

speech."  *WRTL II*, 127 S.Ct. at 2667; *see also id.* at 2669 ("Where the First Amendment

is implicated, the tie goes to the speaker, not the censor.").

       The government plays an important role in preventing the "actuality and

appearance of corruption" in elections.  *Buckley*, 424 U.S. at 26.  As such, Defendants

have a compelling interest in regulating the functional equivalent of express advocacy as

it relates to electioneering communications.  *McConnell*, 540 US at 206.  This compelling

interest generally justifies disclosure requirements.  To obtain a preliminary injunction in

this Circuit, the movant must clearly establish that granting the injunction would not

disserve the public interest.  *Horton*, 272 F. 3d at 1326.  In weighing this factor,

especially during this important election season, the Court feels that the public interest is

---

[10] Defendants also argue that even if Plaintiffs speak under the protection of an injunction, they will not be immunized from future prosecution for that speech.  Defs.' Resp. at 17-18.  This argument would preclude federal courts from ever enjoining a state statute that carried criminal or civil penalties, which is clearly not the law.  *See, e.g., Fla. Retail Fed'n, Inc. v. Att'y Gen.*, No. 4:08-cv-179, 2008 WL 2908003 (N.D. Fla. July 28, 2008) (enjoining enforcement of state firearms law that carried civil penalties); *League of Women Voters v. Cobb*, 447 F. Supp.2d 1314 (S.D. Fla. 2006) (enjoining the enforcement of statute that subjected third-party voter registration organizations to financial penalties for failing to submit voter registration applications in the manner prescribed by the law). In support of their argument, Defendants rely entirely on two cases in which the Supreme Court, applying the "retroactivity doctrine," held that taxpayers were entitled to refunds for taxes that were struck down as unconstitutional.  But Defendants do not cite a single case in which an individual acting under the protection of a preliminary injunction was later prosecuted or fined by the enjoined party following the dissolution of the injunction. Furthermore, any such prosecution "would raise a serious question whether [Plaintiffs] had the state of mind necessary for a violation." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990).

best served by protecting and not chilling free speech.  "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . includ[ing] discussions of candidates . . . ."  *Mills*, 384 U.S. at 218.  Thus, "speech concerning public affairs is more than self-expression; it is the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

However, given the temporal proximity of the election, the extraordinary and drastic nature of a preliminary injunction, *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008) and the disfavored treatment of facial challenges, *Wash. State Grange*, 128 S. Ct. at 1191, the Court also feels that the state's compelling interests must be preserved.  "We respect without question the state's legitimate interest in ensuring the integrity of the electoral process."  *Leake*, 525 F. 3d at 296.   "To the extent the state regulates electoral advocacy within the scope of these interests it is well within constitutional bounds."  *Id*.  In the complete absence of the challenged statute, the state would have no method of regulating that which it has the legal authority to regulate—express advocacy or its functional equivalent.  Thus, to the extent the Florida electioneering communications laws regulate only the functional equivalent of express advocacy, and the speech is susceptible of no reasonable interpretation other than an appeal to vote for or against a specific candidate, the statute regulating such communication remains enforceable.  However, to the extent the Florida electioneering laws also regulate issue advocacy, the Court finds that such regulation violates constitutionally protected free speech.

**VI.     THE BOND REQUIREMENT UNDER F.R.C.P. 65(C) IS WAIVED.**

Federal Rule of Civil Procedure 65(c) provides that a preliminary injunction be issued only if the applicant gives security in an amount determined by the court.  District Courts, however, have discretion to waive this requirement.  *See Baldree v. Cargill, Inc.*, 758 F. Supp. 704, 707 (M.D. Fla. 1990), *aff'd*, 925 F.2d 1474 (11th Cir. 1991); *Caterpillar, Inc. v. Nationwide Equip.*, 877 F. Supp. 611, 617 (M.D. Fla. 1994) (waiving bond requirement in trademark infringement case).  Cases raising constitutional issues are particularly appropriate for a waiver of the bond requirement.  *See*, *e.g.*, *Johnston v. Tampa Sports Authority*, No. 8:05CV2191T-27MAP, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006); *Ogden v. Marendt*, 264 F. Supp.2d 785, 795 (S.D. Ill. 2003); *Smith v. Bd. of Election Comm'rs*, 591 F. Supp. 70, 71 (N.D. Ill. 1984).  Thus, this Court will waive the bond requirement.

Accordingly, it is hereby ORDERED AND ADJUDGED as follows:

1. Effective immediately, Plaintiffs' Motion for Preliminary Injunction (doc. 10) is *granted* as applied to Plaintiffs.

2. Defendants are enjoined from enforcing the electioneering communications provisions of Chapter 106 of the Florida Statutes except for the functional equivalent of express advocacy, which it may properly regulate in accordance with this order.

3. This injunction does not affect any other provisions of Chapter 106, including its regulation of political committees and committees of continuous existence, regulations of the expenditures of candidates and other lawful campaign finance regulations.

4. Pursuant to the limitations discussed above, this preliminary injunction  is binding on Defendants and their officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

5. Plaintiffs' Motion to File Reply Memorandum (doc. 29) is *denied*.

DONE and ORDERED on the <u>twenty-ninth</u> day of October, 2008.


*s/ Stephan P. Mickle*

Stephan P. Mickle
United States District Judge